2002 ME 46

Patricia WALKER

v.

**MAINEGENERAL MEDICAL CENTER.**

Supreme Judicial Court of Maine.

Argued: Jan. 10, 2002.
Decided: March 27, 2002.

Julian L. Sweet (orally), Berman & Simmons, P.A., Lewsiton, Daniel G. Lilley, David Kreisler, Daniel G. Lilley Law Offices, P.A., Portland, for plaintiff.

George C. Schelling (orally), Sandra L. Rothera, Gross, Minsky & Mogul, P.A., Bangor, for defendant, MaineGeneral.

Christopher D. Nyhan, Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Portland, for defendant, Omsberg.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER; and CALKINS, JJ.

CALKINS, J.

[¶ 1] Patricia Walker appeals from a judgment entered in Superior Court (Kennebec County, *Studstrup, J.*) in favor of MaineGeneral Medical Center after two jury trials.[1] The hospital cross-appeals. Patricia Walker argues that the court should have awarded her over $1.2 million in damages for the death of her husband, Ralph Walker Jr., based on the jury verdict in the first trial. She claims that the court erred in ordering a new trial due to jury confusion on the issue of comparative negligence. The new trial resulted in a verdict for the hospital. We affirm the judgment without reaching the cross-appeal.

## I. BACKGROUND

[¶ 2] On June 27, 1994, Dr. Eric Omsberg performed back surgery on Ralph Walker at MaineGeneral Medical Center, then known as Mid–Maine Medical Center. Ralph was discharged on June 29, with instructions from Dr. Omsberg and the hospital to have extremely limited activity for two weeks and to watch for and report to the hospital any indication of infection. He was also given a prescription for an anti-inflammatory steroid that, unbeknownst to him, could mask signs of infection. On July 5, the doctor's secretary telephoned the Walker home and spoke to Patricia Walker. Patricia reported no problems, but according to the secretary, she stated that Ralph was not home.

---

1. Judgment was also granted in favor of defendant Dr. Eric Omsberg. Patricia Walker has not appealed that judgment.

[¶ 3] Dr. Omsberg paid the hospital to provide his answering service for evenings and weekends. The answering service's records indicated that it received a call on July 10 from or regarding Ralph, reporting severe pain, redness, and swelling. According to Dr. Omsberg, he never received this message, and the hospital and Dr. Omsberg contended at trial that the call had actually been made on July 14. Except for the putative July 10 telephone call, Ralph and Patricia did not communicate with the hospital or Dr. Omsberg between July 5 and July 14.

[¶ 4] On July 13, Ralph had pain and chills. That night the surgical wound was seeping discharge. On the morning of July 14, Patricia telephoned the hospital to report Ralph's symptoms. She was told to call the doctor's office, and in a second conversation with the hospital she was told to bring Ralph to the hospital at 3 P.M. At that time he was seen by Dr. Omsberg and readmitted to the hospital with a severe infection. It is undisputed for purposes of this appeal that there was sufficient evidence for the jury to find that the hospital provided negligent care after Ralph's readmission. He died the next morning due to ventricular fibrillation.

[¶ 5] In 1997, Patricia brought a malpractice action individually and as personal representative of Ralph's estate, on behalf of herself and her minor sons, against the hospital and Dr. Omsberg. The case was first tried to a jury in September 2000. The verdict form was drafted by Patricia to reflect the court's rulings at an unrecorded charging conference. The court instructed the jury on the defense of comparative negligence without making a distinction between the two defendants. The comparative negligence instruction permitted the jury to reduce the total damages to a final amount, whereas the court's instruction on how to complete the verdict

form referred to "what reduction there should be to the damages." Immediately following the court's instruction to the jury, Patricia objected to the giving of the instruction on comparative negligence. She gave as her basis for the objection that comparative negligence had not been generated by the evidence and that it was foreclosed by the testimony of one of the expert witnesses.

[¶ 6] The jury first returned an inconsistent verdict, apparently apportioning damages between Dr. Omsberg and the hospital even though it found the doctor not liable. The court instructed the jury to reconsider whether it needed to answer the apportionment question. The jury then returned a verdict as follows: Dr. Omsberg was negligent but his negligence was not a proximate cause of Ralph's death; the hospital was negligent and its negligence was a proximate cause of Ralph's death; Ralph was negligent and his negligence was a proximate cause of his injuries; Ralph's negligence was not greater than or equal to the hospital's; the total wrongful death damages were $1,476,523.40; those damages were reduced to $32,000 due to comparative negligence; and the hospital negligently caused Patricia's emotional distress, for which her damages were $150,000.

[¶ 7] The court and counsel were initially confused about the size of the wrongful death verdict, and there was discussion that the verdict would need to be adjusted to conform to the statutory damages cap. After receiving memoranda from the parties, however, the court entered judgment, consistent with the jury verdict, for Dr. Omsberg and for Patricia against the hospital in the amount of $182,000. Patricia then moved for reconsideration, judgment as a matter of law, additur, or a new trial on damages. The court granted a new trial on all issues and with all parties.

*Walker v. MaineGeneral Med. Ctr.*, No. CV–95–503, 2000 WL 33675688 (Me.Super.Ct. Nov. 14, 2000). A second jury trial took place in April and May 2001. For purposes of this appeal, it is undisputed that the second trial was free of error. The second jury found no negligence by Dr. Omsberg or the hospital,. and judgment was entered accordingly.

## II. COMPARATIVE NEGLIGENCE

[¶ 8] Patricia contends that the court erred by instructing the jury on comparative negligence and by failing to grant her post-trial motion for judgment as a matter of law on the comparative negligence issue. She essentially asserts that the hospital's role in this case did not start until Ralph was readmitted on July 14 and because there was no evidence that Ralph was negligent once he was readmitted to the hospital, a comparative negligence instruction as to the hospital was not warranted. According to Patricia any negligence by Ralph before the hospital readmission could only be considered as a cause of his need for the readmission.

[¶ 9] Patricia relies on *Harvey v. Mid-Coast Hospital*, 36 F.Supp.2d 32 (D.Me. 1999), for the proposition that a hospital is not entitled to a comparative negligence instruction when the plaintiff's negligence is what causes the need for the medical treatment. In *Harvey* the court held that a hospital could not raise a comparative negligence defense based on the conduct of the plaintiff's decedent in attempting suicide by an overdose of drugs. The court noted that contributory/comparative negligence issues in medical malpractice cases generally fall into four categories:

[1] where the plaintiff fails to follow a physician's advice and instructions; [2] where a plaintiff delays seeking or returning for medical attention; [3] where a plaintiff has furnished false, incomplete, or misleading information to his ... physician; and [4] where a patient's negligent or intentional conduct causes the occasion for the medical attention which is the subject of the malpractice action.

*Id.* at 35 (citing Madelyn R. Orr, Comment, *Defense of Patient's Contribution to Fault in Medical Malpractice Actions*, 25 CREIGHTON L. REV. 665, 676–90 (1992)). *Harvey* fell within the fourth category alone, on which there is no Maine precedent. The court surveyed other jurisdictions and found that the majority do not allow a comparative fault defense when the patient's negligence merely provides the occasion for the medical malpractice, and it concluded that this Court would agree with the majority rule. *Id.* at 35–37.

[¶ 10] Although we have not addressed the fourth category of cases discussed in *Harvey*, we have decided cases involving the first and second categories. In *Merrill v. Odiorne*, 113 Me. 424, 425, 94 A. 753, 753 (1915), we held that it was a patient's duty to follow the physician's reasonable instructions and submit to reasonable treatment. The malpractice claim of a patient who breached the duty and whose negligence directly contributed to the injury was barred at common law before the enactment of comparative negligence. We granted the doctor's motion for a new trial in *Merrill* because the jury did not give due consideration to the evidence of the plaintiff's negligence. *Id.* at 425, 94 A. at 754.

[¶ 11] The rule of *Merrill* has been applied consistently, although it has not barred recovery or led to a reduction of damages in any of the subsequent reported decisions. *See Hauser v. Bhatnager*, 537 A.2d 599, 601 (Me.1988) (jury not compelled to find plaintiff negligent because failure to keep scheduled follow-up appointment may not have caused or contrib-

uted to injury); *Crosby v. Grandview Nursing Home,* 290 A.2d 375, 381–82 (Me. 1972) (uncontested evidence showed patient not negligent in failing to follow instructions to wear supportive shoes after treatment of foot injury); *Josselyn v. Dearborn,* 143 Me. 328, 340, 62 A.2d 174, 181 (1948) (contributory negligence instruction not generated where plaintiff followed instructions and did not mislead doctor). These cases indicate that the federal court correctly summarized our law when it stated: "under Maine law a jury may limit or deny a plaintiff's recovery in a medical malpractice action when he or she is found to have acted negligently *in the course of* his or her medical treatment." *Harvey,* 36 F.Supp.2d at 37.

[¶ 12] Patricia does not contest that this is a correct statement of Maine law, and she agrees that it was applicable in her case against Dr. Omsberg. Patricia, however, contends that, as far as the hospital is concerned, any negligence by Ralph merely provided the occasion for the hospital's negligent treatment, which under *Harvey* would not warrant submitting the hospital's comparative fault defense to the jury.

▮▮ [¶ 13] Thus, the crux of Patricia's argument is her attempt to distinguish the position of the hospital on the issue of comparative negligence from that of Dr. Omsberg. This, however, is a distinction she never raised during the trial. She did not make a motion for judgment as a matter of law at the close of the evidence pursuant to M.R. Civ. P. 50(a). Her general objection to the comparative negligence instruction did not bring her present argument to the court's attention.

▮▮ [¶ 14] When the grounds for an objection were not "stat[ed] distinctly," M.R. Civ. P. 51(b), our review is for obvious error. *Reno v. Townsend,* 1997 ME 198, ¶ 4, 704 A.2d 309, 311; *Fuller v. Cent. Me. Power Co.,* 598 A.2d 457, 460 (Me. 1991). Patricia raised her argument for the first time after trial in a motion for judgment as a matter of law, purportedly pursuant to M.R. Civ. P. 50(b). A Rule 50(b) motion, however, is properly a *renewal* of the earlier motion; failure to make a timely Rule 50(a) motion therefore waives appellate review of the denial of the post-trial motion. *Nordic Sugar Corp. v. Me. Guar. Auth.,* 447 A.2d 1239, 1241 (Me. 1982); *see also* 9 MOORE'S FEDERAL PRACTICE § 50.91[1] (3d ed.2001); 9A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2540, at 368 (2d ed.1995). Patricia has waived any appellate review of the denial of her motion for the judgment as a matter of law,[2] and we review the court's decision to give a comparative negligence instruction for obvious error only.

▮▮ [¶ 15] We discern no obvious error. Contrary to Patricia's contention, there was sufficient evidence from which the jury could have found that Ralph was negligent *during* his course of treatment by the hospital. First, the relevant relationship between Ralph and the hospital did not begin on his readmission on July 14, but continued from the time of his surgery on June 27 until his death. The June 29 discharge instructions came from the hospital, not just Dr. Omsberg. The instructions told Ralph to call the hospital, not Dr. Omsberg, to report any signs of infection. The hospital, through the nurse who gave the discharge instructions, failed to tell Ralph that the steroid he was pre-

---

**2.** Although the hospital did not object before the trial court to the absence of a Rule 50(a) motion, the court gave as a reason for denying the post-trial motion that Patricia's failure to make "this more specialized argument at trial deprived MaineGeneral and the court of an opportunity to give more specific attention to the argument at that time."

scribed could mask such signs of infection. It was the hospital's answering service that may have received the telephone call reporting Ralph's serious symptoms on July 10 and may have failed to convey the message to Dr. Omsberg. On the morning of July 14, Patricia first telephoned the hospital, not Dr. Omsberg, and instead of being told to bring Ralph to the emergency room immediately, she was eventually told to bring him in at 3 P.M.

[¶ 16] Second, there was evidence that Ralph was negligent within this course of treatment by the hospital. Although he was instructed to have very limited activity, there was evidence that Patricia told the doctor's secretary that he was out of the house on July 5. He was instructed to report any signs of infection, and multiple medical experts opined that such signs must have been present from several days to over a week before his readmission; if the jury found, as it could have, that no telephone call was made on July 10, it could have concluded that Ralph negligently failed to report the infection to the hospital. This view of the evidence was also supported by Dr. Omsberg's version of his conversation with Patricia after Ralph died. He testified that she said Ralph "had probably overdone things since his surgery." He also testified that Patricia told him that she wanted Ralph to come in sooner because he was obviously sick. Dr. Omsberg further testified that Patricia said that she had begged Ralph to let her call and take him in sooner but he would not let her. Dr. Omsberg's notes also indicated, apparently based on information from Patricia, that Ralph had had spotty drainage from the wound on a daily basis since leaving the hospital but had not reported it.

[¶ 17] Finally, medical experts testified that Ralph would likely have survived if he had been treated sooner. On the basis of all this evidence, the jury reasonably could have concluded that Ralph was negligent in failing to follow the discharge instructions and failing to return for treatment, and that his negligence was a proximate cause of his injuries and death. Even under *Harvey*, the court did not commit obvious error by instructing the jury on the hospital's comparative negligence defense.

## III. NEW TRIAL

[¶ 18] We review the grant of a new trial only for "clear and manifest" abuse of discretion, *Chenell v. Westbrook College*, 324 A.2d 735, 737 (Me.1974); thus, the scope of our review is "very limited," *Gammon v. Verrill*, 651 A.2d 831, 833 (Me. 1994). Apparent jury confusion is grounds for a new trial. *Gould v. Bangor & Aroostook R.R. Co.*, 292 A.2d 837, 839 (Me.1972) (new trial required where inconsistent verdicts reflected jury confusion traceable to inadequate instructions). Here the trial court granted a new trial on the grounds that:

> After considering the totality of the circumstances, including the wording of the verdict form, the difficulty the jury demonstrated in using the form, the court's instruction concerning the use of the form, and the vast disparity between the total damages as found by the jury and the amount which purports to have been awarded, plus the court's own misapprehension of the jury's action, the court finds such opportunity for confusion and ambiguity that it must order a new trial in the interest of justice.

[¶ 19] Although she suggested otherwise at oral argument, it is clear from the record that at the time of her new trial motion, Patricia preferred a new trial to the entry of judgment for only $182,000. She now contends that a new trial was not necessary, even if the court did not err in

submitting the comparative negligence issue to the jury, and in support of this contention she makes several arguments.

## A. Verdict Form

[¶ 20] First, Patricia argues that the literal wording of the verdict form, drafted by her attorney, supported an entry of judgment with no reduction for comparative negligence. Question 4 asked whether the hospital's negligence was a proximate cause "of the *death*" of Ralph, while Question 5 asked whether Ralph's negligence was a proximate cause "of his *injuries*." Patricia contends that "injuries" are distinct from "death," and because the jury only found Ralph responsible for his own injuries, there should be no reduction in the damages awarded for his death.

[¶ 21] In rejecting this argument, the trial court found that the terms "death" and "injuries" "are included within each other and that for purposes of the verdict form they constitute a distinction without a difference." That finding was reasonable and well-supported by the record, as no distinction between death and injuries was drawn in the jury instructions or otherwise at trial. It is likely that the jurors did not notice the distinction on the verdict form because it was not called to their attention. If the jury did notice the distinction, the resulting confusion would be an additional reason for granting a new trial.

## B. Purported Jury Intent

[¶ 22] Question 9 on the verdict form stated: "To what dollar amount is the total amount of damages found in your answer to question no. 8 to be reduced after deducting a just and equitable sum having regard to the negligence of Ralph Walker, Jr.?" Patricia attempted to offer affidavits to show that the jury intended to reduce the wrongful death damages *by* $32,000 rather than *to* $32,000. She claims that the court should have entered judgment for her in the amount of $1,244,523.40.[3] She contends that the verdict is irrational and, therefore, the jury could not have intended it.

[¶ 23] Two of our cases with similar facts are relevant. In *Cyr v. Michaud,* 454 A.2d 1376, 1379 (Me.1983), the jury, in response to an almost identical question on the verdict form, reduced the plaintiff's damages by $20,000, from $100,000 to $80,000. The defendant contended that the verdict form was ambiguous and that the jury's intent— as shown in affidavits from all the jurors— was to reduce the damages by $80,000, from $100,000 to $20,000. We held that the defendant could not now complain about the verdict form since he had helped draft it, that in any event the form was not ambiguous, and that the affidavits were inadmissible to show a mistake in the jury's verdict. *Id.* at 1380–81, 1384.

[¶ 24] More recently, in *Taylor v. Lapomarda,* 1997 ME 216, ¶¶ 3, 4, 702 A.2d 685, 686, the jury reduced the plaintiff's damages by $8000, from $8500 to $500. After the jury was discharged, the jurors returned, stated that they had made a mistake, and sent the trial court a note indicating that they had intended to reduce

---

**3.** This figure represents the $1,476,523.40 total wrongful death damages found by the jury, minus the purported $32,000 reduction for comparative negligence, minus the $350,000 by which the $500,000 loss of consortium award was thought to exceed the statutory cap, plus the $150,000 damages for Patricia's separate claim of negligent infliction of emotional distress. The trial court held that the applicable cap on nonpecuniary damages under the Wrongful Death Act, 18–A M.R.S.A. § 2–804(b) (1998), was $150,000, and the parties do not raise the issue on appeal. In light of our recent decision in *Greenvall v. Maine Mutual Fire Insurance Co.,* 2001 ME 180, 788 A.2d 165, however, it appears that the applicable cap was actually $75,000.

the damages by $500, from $8500 to $8000. *Id.* ¶ 4, 702 A.2d at 686. The court denied the plaintiff's request to set aside the verdict and order a new trial, and we affirmed, holding that under *Cyr* the jury note provided no basis to disturb the verdict. *Id.* ¶¶ 7–10, 702 A.2d at 687–89.

[¶ 25] *Cyr* and *Taylor* are controlling here. There was no admissible evidence to indicate that the jury did not intend the result indicated by the unambiguous verdict form, and the court would not have been justified in entering judgment as requested by Patricia. Patricia points out that the 98% reduction of damages in this case is greater than in any of the reported decisions.[4] That fact, however, when combined with the potentially confusing jury instructions, the jury's first mistaken attempt to enter a verdict, and the other factors mentioned by the trial court in ordering the new trial, was further reason to set aside the verdict and grant a new trial.

C. Additur

[¶ 26] Patricia argues that the court should have given the hospital an opportunity to accept an additur before ordering a new trial. She cites M.R. Civ. P. 59(a): "A new trial shall not be granted solely on the ground that the damages are inadequate until the defendant has first been given an opportunity to accept an addition to the verdict of such amount as the court judges to be reasonable." Here, however, the court did not find the damages inadequate or order a new trial on that ground, let alone *solely* on that ground. *See Chenell,* 324 A.2d at 738–39 (no abuse of discretion to deny additur and grant new trial when

damages inadequate but inadequacy appeared to reflect compromise verdict). The court's stated reasons for the new trial, as quoted above, were confusion and ambiguity, not inadequate damages. The court did not abuse its discretion in denying the motion for additur.

D. New Trial on Damages Alone

[¶ 27] Finally, Patricia contends that if a new trial was warranted, it should have been on damages only. Patricia, however, offers no analysis of how two separate juries could decide the closely-linked issues of the degree of comparative negligence and the appropriate reduction of damages, nor does she offer any authority for the proposition that a new trial can be granted on damages alone in a comparative negligence case. She cites *McKellar v. Clark Equipment Co.,* 101 F.R.D. 93, 95 (D.Me.1984), where the federal court granted a bifurcated trial in a comparative negligence case, but that opinion actually undermines her argument. The decision to bifurcate in *McKellar* was based on the court's conclusion that the issues of comparative fault and damage reduction "can be treated as free-standing issues which, *if tried to the same jury,* may be resolved in strict accordance with the requirements of the substantive law of the State of Maine on comparative negligence." *Id.* (emphasis added). In the present case "the question of damages is 'so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty, which would amount to the denial of a fair trial.'" 2 FIELD, MCKUSICK & WROTH, MAINE CIVIL PRACTICE § 59.2 (2d ed.1970) (quoting *Gasoline Prods. Co. v. Champlin*

---

4. *See Taylor,* 1997 ME 216, ¶ 3, 702 A.2d at 686 (94% reduction); *Pomeroy v. Glidden,* 1997 ME 118, ¶ 4, 695 A.2d 1185, 1186 (affirming 86% reduction from $125,000 to $18,000); *Pelletier v. Fort Kent Golf Club,* 662 A.2d 220, 221 (Me.1995) (affirming 84% reduction from $250,000 to $40,000); *Jackson v. Frederick's Motor Inn,* 418 A.2d 168, 174 (Me.1980) (affirming 59% reduction from $25,000 to $10,179).

*Refining Co.,* 283 U.S. 494, 500, 51 S.Ct. 513, 75 L.Ed. 1188 (1931)). The court did not abuse its discretion in ordering a complete new trial.

The entry is:

Judgment affirmed.